UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>HECTOR AGUIRRE,<br><br>Defendant. | Case No. 1:23-cr-00187-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

# I. INTRODUCTION

Pending before the Court is Defendant Hector Aguirre's Motion to Suppress. Dkt. 18. The Court held an evidentiary hearing on August 22, 2024, and took the matter under advisement. For the reasons set forth below, the Motion to Suppress is denied.

# II. BACKGROUND

On June 29, 2023, Caldwell Police Officers Seferino Tapia and Austin Peccorini were assigned to Operation Safe Streets for the Caldwell Police Department. Dkt. 18-2, Ex. A at 7.[1] During the evidentiary hearing, Tapia explained that Operation Safe Streets deals with gang investigations, gang members, wanted fugitives, repeat offenders, and low to mid-level drug dealers. Dkt. 38, at 6:19–7:1.

---

[1] Page citations are to the CM/ECF-generated page number.

While patrolling near the intersection of E. Homedale Rd. and S. Indiana Ave. in Caldwell, Tapia and Peccorini observed Defendant Hector Aguirre driving a black Pontiac without a front license plate. The officers conducted a Department of Motor Vehicles inquiry on the Pontiac's rear license plate and learned that the registration on the vehicle was suspended due to a lack of insurance. Because failing to display a front license plate is a violation of Idaho Code Section 49-428, and operating a motor vehicle without valid liability insurance is a violation of Idaho Code Sections 49-1229 and 49-1428, the officers initiated a traffic stop.

As they pulled up behind Aguirre's vehicle, Tapia and Peccorini activated their body cameras. Tapia stated, "suspended for insurance, right? He's a Northsider too."[2] Dkt. 18-2, Ex. B *Tapia* at 00:09–00:12. During the evidentiary hearing, Tapia explained he was aware Aguirre was a Northsider because he had interacted with him in the past and knew he was gang affiliated. Dkt. 38, at 7:21–25. When Tapia and Peccorini approached Aguirre's vehicle,[3] the front driver's-side window was open a few inches, and the front passenger-side window was completely rolled down. Tapia testified that Aguirre's front driver's-side window was tinted, which partially obstructed his view into the vehicle. *Id.* at 17:1–4. A red bandana—a symbol associated with the "Northside" or "Norteño" gang—

---

[2] The term "Northsider" is synonymous with the Norteño gang. Peccorini highlighted in his Police Report that Aguirre was "flagged as a Norteño gang member from Nampa PD with a most recent contact of 1/30/2023 and 09/05/2020." Dkt. 18-2, Ex. A at 11.

[3] Aguirre was the driver and sole occupant of the car.

was also visible hanging from around the rearview mirror. Dkt. 18-2, Ex. B *Tapia* at 00:26; Dkt. 18-2, Ex. A at 11.

Tapia immediately asked Aguirre to roll the driver's-side window all the way down, but Aguirre responded, "I can't, it's broken." *Id*. at 00:28–00:30. Tapia questioned, "Can you open the door?" *Id*. at 00:31. Aguirre made a hand gesture of pulling the inside door handle and then put his hand outside the window and pointed towards the outside door handle. *Id*. at 00:31. Aguirre also stated, "from the inside, can't open it." *Id*. at 00:37. Tapia testified that he couldn't understand Aguirre through the partially open driver's-side window. Dkt. 38, at 21:14–21.

The parties dispute what happened next. Aguirre contends Tapia "abruptly opened the driver's door and reached into the interior of the vehicle without consent." Dkt. 18-1, at 5. In his police report, Tapia stated he tried to open the door from the outside, but, when the door would not open, Aguirre opened it from the inside. Dkt. 18-2, Ex. A at 8. While from the body camera footage it appears clear that Tapia ultimately opened the door, Tapia's mistaken assumption that Aguirre opened the door is understandable given both the hurried nature of the encounter and the deconstructed state of Aguirre's door.[4] Dkt. 18-2, Ex. B *Tapia* at 00:28–00:41.

---

[4] Aguirre argues: "That Officer Tapia denied opening the door, instead attributing it to Aguirre, and that the fact is demonstrably untrue should contribute to this Court's assessment as to whether or not the government has met its evidentiary burden by a preponderance of the evidence." Dkt. 31, at 3. While Tapia stated in his police report that Aguirre opened the door, Dkt. 18-2, Ex. A at 8, Tapia explained during the evidentiary hearing that he initially believed Aguirre must have opened the door from the inside since the door wouldn't open when Tapia pulled on the outside handle and because the driver's-side door appeared to be inoperable. Dkt. 38, at 8:23–10:1. After listening to Tapia's testimony, the Court finds his police report was based on a mere misunderstanding of what occurred during his quick encounter with Aguirre, rather than on any

When Tapia asked Aguirre for his license, registration, and proof of insurance, Aguirre produced his license but stated he did not have his registration or proof of insurance. Dkt. 18-2, Ex. B *Tapia* at 1:00–1:07. Tapia then asked Aguirre a series of questions, including whether he was on probation. *Id*. at 1:12–1:17. Tapia testified that he asked Aguirre whether he was on probation because there was a red bandana—indicia of Norteño gang membership—hanging from the rearview mirror, and also because he had "dealt with [Aguirre] in the past for failing to appear for court dates" so he "wasn't sure if [Aguirre] was going to be wanted." Dkt. 38, at 10:14–25.

While Tapia spoke to Aguirre, Peccorini took Aguirre's driver's license back to his car to run document checks. Caldwell Police Officer Talon Derrick then arrived at the scene and took over Peccorini's position as support officer at Aguirre's open front passenger-side window. When Derrick arrived, Tapia asked Aguirre, "Is there anything illegal in the vehicle, Hector?" Dkt. 18-2, Ex. B *Tapia* at 1:50. Aguirre responded, "Uh no, I don't see anything … [unintelligible]." *Id*. at 1:52–53. Tapia then asked, "Is it ok if I search the vehicle?" *Id*. at 1:54. Aguirre replied, "Uh, I prefer not, but … [unintelligible]." *Id*. at 1:57–

---

intent to deceive. Regardless, even if Tapia was intentionally misleading in his police report, the Supreme Court has repeatedly held an officer's subjective motivations are irrelevant when determining whether a particular search or seizure is reasonable under the Fourth Amendment. *Brigham City v. Stewart*, 547 U.S. 398, 404 (2006) ("An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.'") (emphasis in original) (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)); *Whren v. United States*, 517 U.S. 806, 813 (1996) ("[W]e have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers[.]"); *Graham v. Connor*, 490 U.S. 386, 397 (1989) ("[O]ur prior cases make clear" that "the subjective motivations of the individual officers . . . ha[ve] no bearing on whether a particular seizure is 'unreasonable' under the Fourth Amendment.").

58. Tapia responded, "Okay, hang tight for me with Officer Derrick, and I'll be back." *Id*. at 2:00–2:02.

Tapia then left his position at Aguirre's driver's-side door and went back to his patrol vehicle to contact Aguirre's probation officer. *Id*. at 2:03. As he did so, Tapia told Peccorini that Aguirre looked "rough." *Id*. at 2:51. Peccorini responded, "Yeah, and he's very fidgety too." Dkt. 18-2, Ex. B *Peccorini* at 2:47–2:49. While on the phone with Aguirre's probation officer, Officer Rob Reynolds, Tapia learned Aguirre had been absconding and that Reynolds planned to submit for an agent's warrant. Dkt. 18-2, Ex. A at 8.

Derrick testified that when he arrived at the scene, he did not know why Aguirre had been pulled over. Dkt. 38, at 30:5–8. As he approached Aguirre's passenger-side door, Derrick leaned down to speak to Aguirre through the open passenger window, and, in doing so, placed his hands on the frame of the passenger-side window. Dkt. 18-2, Ex. B *Derrick* at 00:33. Derrick observed Aguirre was speaking very quietly and "seemed moderately lethargic." Dkt. 38, at 30:21–22. Given this, Derrick leaned down toward the passenger side window so that he "could hear the conversation that was going on with Officer Tapia" and also have his own conversation with Aguirre. *Id*. at 31:14–19.

Due to the angle of Derrick's body camera, which was pointed towards Aguirre's passenger door, Aguirre's responses to Derrick's questions are largely inaudible. However, Derrick repeated each response. For instance, Derrick first asked, "What did you get pulled over for, dude?" Dkt. 18-2, Ex. B *Derrick* at 00:36. Aguirre inaudibly responded, and Derrick confirmed, "Oh, you don't have a front license plate on your car?" *Id*. at 00:45–

00:46. When Derrick asked Aguirre how long he had owned his car (*Id.* at 1:10) Aguirre inaudibly responded, and Derrick repeated back, "For a good minute?" *Id.* at 1:13. Derrick then questioned, "How much marijuana is in your car?" *Id.* at 1:15. Derrick testified that he smelled the odor of marijuana in Aguirre's vehicle prior to asking the latter question. Dkt. 38, at 32:8–11. Aguirre inaudibly responded, and Derrick repeated, "A lot?" Dkt. 18-2 Ex. B *Derrick* at 1:19. Aguirre then *audibly* stated, "Not a lot, I mean, it's in the back… [unintelligible]." *Id.* at 1:21–1:23. Upon Aguirre's admission that there was marijuana in the car, Derrick stated, "Oh, I can smell it." *Id.* at 1:25.

Derrick then notified the other officers that he had probable cause to search the vehicle and asked Aguirre to step out of the car.[5] *Id.* at 1:30–1:36. At that point, Tapia was speaking to Reynolds on the phone, while Peccorini was processing Aguirre's traffic infractions. Dkt. 18-2, Ex. B *Tapia* at 3:03 and *Peccorini* at 2:58. The total time from the beginning of the traffic stop—when Tapia and Peccorini approached Aguirre in his vehicle—and Aguirre's admission that there was marijuana in the car—was approximately two minutes and thirty seconds. *Id.* at *Tapia* 00:26–3:03.

During the subsequent search of the vehicle, the officers recovered a Guardian .25 caliber handgun containing four rounds of ammunition, with one round in the chamber. Dkt. 18-2, Ex. A at 12. Inside a black pouch hidden in the driver's-side door, officers located sixty-six Fentanyl pills. *Id.* at 10, 16. Officers also discovered marijuana in the vehicle, as well as marijuana paraphernalia both on Aguirre's person and throughout his

---

[5] Possession of any amount of marijuana is illegal in Idaho. Idaho Code § 37-2705(d)(22).

car. *Id*. at 8, 10, 16. Given his prior felony conviction, Aguirre was ultimately charged with Unlawful Possession of a Firearm in violation of 18 U.S.C. § 922(g)(1), and Possession with Intent to Distribute a Controlled Substance in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). Dkt. 2.

### III. LEGAL STANDARD

The Fourth Amendment guarantees the right of individuals "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Mapp v. Ohio*, 367 U.S. 643, 646 n.4 (1961) (quoting U.S. Const. amend. IV). The Fourth Amendment "does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250 (9th Cir. 1991). Consequently, the "touchstone" of a court's analysis under the Fourth Amendment "is always 'the reasonableness in all the circumstances of the particular government invasion of a citizen's personal security.'" *Pennsylvania v. Mimms*, 434 U.S. 106, 108–109 (1977) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968)). "[T]here is 'no ready test for determining reasonableness other than by balancing the need to search (or seize) against the invasion which the search (or seizure) entails." *Terry*, 392 U.S. at 21.

Searches and seizures conducted without a warrant are "per se unreasonable under the Fourth Amendment" subject to "a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (cleaned up). Two exceptions to the warrant requirement are relevant in this case.

First, in *Terry*, the Supreme Court held that "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal

activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous," the officer may briefly stop the suspicious person and make "reasonable inquiries" aimed at confirming or dispelling his suspicions. *Terry*, 392 U.S. at 30. An investigatory stop must be both "justified at its inception," and "reasonably related in scope to the circumstances which justified the interference in the first place." *Id*. at 20.

A traffic stop is more like a *Terry* stop than a formal arrest. *Knowles v. Iowa*, 525 U.S. 113, 117 (1998) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)). As such, officers may temporarily "seize" a driver to investigate a traffic violation. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Id*. (cleaned up). During a lawful traffic stop, officers may make certain unrelated inquiries, provided such inquiries do not lengthen the roadside detention. *Id*. at 354–55. However, absent independent reasonable suspicion, the authority for a traffic stop "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id*. at 354 (citing *United States v. Sharpe*, 470 U.S. 675, 686 (1985)).

Second, the automobile exception to the warrant requirement permits police to search a vehicle when the car is "readily mobile" and "probable cause exists to believe it contains contraband." *United States v. Davis*, 530 F.3d 1069, 1084 (9th Cir. 2008) (cleaned up). "The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." *California v. Acevedo*, 500 U.S. 565, 580 (1991). "The reasons for this exception are twofold: the expectation of

privacy in one's vehicle is less than in one's home, and the mobility of vehicles necessitates faster action on the part of law enforcement officials." *United States v. Pimelo-Hernandez*, 262 F.3d 974, 978 (9th Cir. 2001) (citing *California v. Carney*, 471 U.S. 386, 390 (1985)).

In the absence of an exception to the exclusionary rule, evidence seized through an unreasonable search or seizure must be excluded. Further, evidence discovered through the "exploitation of" an unlawful search or seizure must also be suppressed as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963). Evidence qualifies as "fruit of the poisonous tree" when "the illegal activity tends to significantly direct the investigation to the evidence in question." *United States v. Johns*, 891 F.2d 243, 245 (9th Cir. 1989) (quoting *United States v. Chamberlin*, 644 F.2d 1262, 1269 (9th Cir. 1980)).

## IV. ANALYSIS

In his Motion to Suppress, Aguirre concedes that Tapia and Peccorini acted appropriately when they stopped him for having committed traffic infractions in their presence. Dkt. 18-1, at 5. However, Aguirre argues the Court must suppress all of the evidence found in his vehicle because: (1) Tapia allegedly unlawfully opened his door and reached inside the vehicle; (2) Tapia's purported violation tainted all subsequent actions conducted by the officers; (3) even if Tapia's initial "entry" into the car did not taint the rest of the traffic stop, Derrick subsequently "unlawfully entered the vehicle" by resting his hands on, and "lean[ing] into and across the plane of the passenger-side window"; and (4) the officers unlawfully expanded the scope of the traffic stop without reasonable suspicion. Dkt. 18-1, at 6.

The Court addresses each contention in turn.

## A. Tapia's "entry" into Aguirre's vehicle

### 1. Reach inside Aguirre's vehicle

Aguirre first contends Tapia violated his Fourth Amendment rights by "abruptly open[ing] Aguirre's driver's side door and reach[ing] into the interior of the vehicle without consent." *Id.* at 5. However, in both his briefing on the Motion to Suppress, and during the evidentiary hearing, Aguirre neither explained how, nor identified precisely where on the body camera footage, Tapia allegedly reached inside Aguirre's vehicle. *See generally* Dkt. 18-1; Dkt. 30; Dkt. 38. The Court repeatedly viewed the entirety of Tapia's initial interaction with Aguirre to ascertain whether Tapia reached inside Aguirre's vehicle prior to the probable cause search. *Id.* at 00:27–2:02. As the Government highlighted in its Response brief, Tapia did not, in fact, reach inside Aguirre's car at any point prior to the probable cause search. Dkt. 27, at 5 n.5.[6] The Court accordingly considers solely whether Tapia violated the Fourth Amendment by opening Aguirre's driver's-side door.

### 2. Opening Aguirre's vehicle door

A search occurs where the government invades a place in which a person has a reasonable expectation of privacy. *United States v. Jones*, 565 U.S. 400, 406 (2012) (citing *Katz v. United States*, 389 U.S. 347, 351 (1967)). Although "[o]ne who owns and possesses a car, like one who owns and possesses a house, almost always has a reasonable expectation of privacy in it," *Byrd v. United States*, 584 U.S. 395, 404 (2018), "[t]here is no legitimate

---

[6] Aguirre appears to concede this point by failing to address it in either his Reply brief, or during the evidentiary hearing. *See generally*, Dkt. 30; Dkt. 38.

expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers." *Texas v. Brown*, 460 U.S. 730, 740 (1983) (cleaned up). Thus, police officers may lawfully require a driver to exit his vehicle during a traffic stop even though it exposes a portion of his person to view. *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977) ("*Mimms*"). The *Mimms* Court held such an intrusion is "de minimus" because it requires the driver "to expose to view very little more of his person than is already exposed." *Id*. In addition, such intrusion is justified because it enhances officer safety, prevents drivers from making unobserved movements, and reduces the likelihood that an officer will be the victim of an assault. *Id*. at 110–111. Thus, "once a vehicle has been lawfully detained for a traffic violation … police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." *Id*. at 111 n.6. This is true even when officers lack any particularized suspicion. *Id*. at 108–111.

Similarly, in *New York v. Class*, 475 U.S. 106, 108 (1986), officers made a lawful traffic stop. Rather than staying in his vehicle, the driver immediately emerged and approached one of the officers. In the meantime, another officer opened the vehicle's door and reached inside to move papers obscuring the car's vehicle identification number ("VIN"), which is ordinarily viewable through the front windshield. *Id*. Although the Supreme Court held the officer's reach inside the vehicle was a "search," it found the search did not violate the Fourth Amendment because the minimal intrusion revealed only that which is ordinarily in plain view of someone outside the vehicle. *Id*. at 111–115. As such, the defendant did not have a reasonable expectation of privacy in the VIN. *Id*. at 114.

In so holding, the Supreme Court explained that if the driver had simply remained in his car, the officer would have been justified in asking him to move the papers obscuring the VIN.[7] *Id.* at 115 ("[W]e have no difficulty in concluding that a demand to inspect the VIN, like a demand to see license and registration papers, is within the scope of police authority pursuant to a traffic violation stop.") (citing *Delaware v. Prouse*, 440 U.S. 648, 659 (1979)). And, if the driver "had stayed in his vehicle and acceded to such a request from the officer, the officer *would not have needed to intrude into the passenger compartment*." *Id.* at 115 (emphasis added). The driver chose, however, to exit the vehicle without removing the papers that covered the VIN, and the officer chose to conduct his search without asking the driver to return to his car. The *Class* Court held "the officer acted within the bounds of the Fourth Amendment in conducting the search." *Id*.

Under *Class*, it appears Tapia's mere opening of the car door did not constitute a search because he never actually entered the vehicle. 475 U.S. at 108, 115 (while noting officer both opened the door and reached inside the driver's vehicle, holding only that officer's physical intrusion into the interior of the vehicle was a search). However, even if opening Aguirre's door alone constituted a search—a proposition Aguirre cites no authority to support—doing so was constitutionally permissible because it was both minimally intrusive and justified under the circumstances. *Id.* at 118 ("When we undertake

---

[7] The *Class* Court held it "made no difference that the papers in respondent's car obscured the VIN from the plain view of the officer" because "efforts to restrict access to an area do not generate a reasonable expectation of privacy where none would otherwise exist." *Id.* at 114 (citation omitted). Likewise, Aguirre's inability to open his driver's-side door did not create a reasonable expectation of privacy to any (unidentified) portions of his person or front seat which opening the door revealed. *Id*.

the necessary balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion' the conclusion that the search here was permissible follows.") (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)).

First, Tapia neither ordered Aguirre to exit his vehicle, nor detained Aguirre outside of the vehicle, as the Supreme Court authorized in *Mimms*, 434 U.S. at 111, and *Class*, 475 U.S. at 118, respectively. Instead, Tapia opened the driver's-side door only after Aguirre would not or could not do so himself. Despite Aguirre's failure to comply with his instructions, Tapia also allowed Aguirre to remain seated in his car. Tapia did not remove Aguirre from the vehicle, reach into the interior of the vehicle, open any containers inside the vehicle, or reach into any compartments inside of the vehicle. In fact, unlike the constitutionally permissible search in *Class*, Tapia did not intrude into the interior of Aguirre's vehicle at all. *Class*, 475 U.S. at 118.

Significantly, Aguirre had also completely rolled down his passenger-side window prior to the stop. Peccorini's body camera footage shows Peccorini could clearly see the interior of the front seat of Aguirre's car through Aguirre's completely open passenger-side window *before* Tapia opened the driver's-side door. Dkt. 18-2, Ex. B *Peccorini* at 00:21–00:39. Given this, and because Tapia could have lawfully ordered Aguirre to exit his vehicle entirely, Tapia's additional intrusion of opening Aguirre's driver's-side door can only be described as, at most, "a mere inconvenience." *Mimms*, 434 U.S. at 111.

Second, Tapia was entitled to speak to Aguirre and obtain his license, registration, and insurance information upon stopping Aguirre for traffic infractions. *Prouse*, 440 U.S.

at 658 ("We agree that the States have a vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles, that these vehicles are fit for safe operation, and hence that licensing, registration, and vehicle inspection requirements are being observed."). Had Aguirre either opened his door or rolled down his driver's-side window himself—rather than apparently deconstructing his vehicle so that neither was possible—Tapia would not have needed to open the door. Because Aguirre's actions barred Tapia from both addressing the traffic violations that warranted the stop and from attending to related safety concerns, opening the driver's-side door was justified.[8] *Class*, 474 U.S. at 118; *Rodriguez v. United States*, 575 U.S. 348, 356 (2015) ("Traffic stops are especially fraught with danger to police officers, so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely.").

In arguing to the contrary, Aguirre relies upon the Ninth Circuit's holding in *United States v. Ngumezi*, 980 F.3d 1285, 1288 (9th Cir. 2020). Dkt. 18-1, at 5–7; Dkt. 31, at 3–4. The *Ngumezi* court concluded police officers "who have reasonable suspicion sufficient to

---

[8] Moreover, like the defendants in *Mimms* and *Class*, it cannot be ignored that Aguirre had a loaded firearm in his car. *Mimms*, 434 U.S. at 108; *Class*, 475 U.S. at 116. In *Mimms*, the Supreme Court held officers were permitted to guard against the possibility of violence—even though there the officers lacked any particularized reason for believing the defendant possessed a weapon—by requiring the defendant to briefly exit his vehicle. 434 U.S. at 111. Similarly, the *Class* Court held that though they had no reason to suspect the defendant was dangerous or that his car contained contraband, officers could briefly detain the defendant outside of his vehicle once he voluntarily exited it, and could also initiate a search for the VIN necessary only because of that detention, because "[t]o have returned [defendant] immediately to the automobile would have placed the officers in the same situation that the holding in *Mimms* allows officer to avoid—permitting an individual being detained to have possible access to a dangerous weapon and the benefit of the partial concealment provided by the car's exterior." *Class*, 475 U.S. at 116. Likewise, failing to open Aguirre's driver's-side door would have allowed Aguirre access to the loaded firearm concealed in his backseat.

justify a traffic stop—but who lack probable cause or any other particularized justification, such as a reasonable belief that the driver poses a danger—may [not] open the door to a vehicle and lean inside." 980 F.3d at 1288. The facts at issue in *Ngumezi* illustrate the search in this case—if any—was reasonable. As discussed above, unlike the officer in *Ngumezi*, Tapia did not enter the interior of Aguirre's vehicle. Because Tapia opened Aguirre's door, but did not reach or lean inside, the *Ngumezi* Court's "bright-line rule that opening a door *and entering the interior space of a vehicle* constitutes a Fourth Amendment search" is inapplicable. *Id*. at 1289 (emphasis added).

In addition, the officer in *Ngumezi* approached a parked car without license plates, immediately opened the vehicle's passenger-side door, leaned inside the vehicle, and began questioning the defendant. Prior to doing so, the officer neither approached the defendant at the driver's-side door, nor asked the defendant to roll down either of his windows, nor even alerted the defendant to his presence. *Id*. at 1286. By contrast, here Tapia lawfully initiated a traffic stop, approached the driver's-side window, and asked Aguirre to roll it down. When Aguirre could not do so, Tapia asked Aguirre to open his driver's-side door. When Aguirre again failed to comply, and even indicated the door could only open from the outside, Tapia resorted to opening the door himself. And again, Tapia's intrusion, if any, "was conducted without breaking the plane of the car's surface," making Aguirre's situation distinguishable from that in *Ngumezi*. *Id*. at 1290. In short, unlike the actions of the police officer in *Ngumezi*, Tapia's conduct was both minimally intrusive and justified by the need to both speak to, and obtain information from, Aguirre. *Id*. at 1289.

Third, and finally, unlike the officers in *Mimms*, *Class*, and *Ngumezi*, Tapia also had particularized justification to open Aguirre's driver's-side door. Although present in all traffic stops, the risk to officer safety was particularly heightened in this case. *Mimms*, 434 U.S. at 110 ("We have specifically recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile[;] [a]ccording to one study, approximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile."). Tapia confirmed that, due to Aguirre's known gang affiliation, he was concerned Aguirre may be dangerous when he approached Aguirre's driver's-side window. Dkt. 38, at 17:5–6. Such concern was amplified by Aguirre's display of gang indicia, tinted driver's-side window, past failure to appear for court dates, difficulty communicating with Tapia, inability to comply with Tapia's instructions, and observably "rough" and "fidgety" presentation.[9] *Id*. at 7:18–25, 8:8–15, 10:14–25, 21:14–21; Dkt. 18-2, Ex. B *Tapia* at 2:51; Dkt. 18-2 Ex. B *Peccorini* at 2:47–2:49. Given such concerns, the Court finds it was reasonable for Tapia to open the driver's-side door. Where, as here, "the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief that the action taken was appropriate' there is little question the officer was justified." *Mimms*, 434 U.S. at 112 (quoting *Terry*, 392 U.S. at 21–22).

In sum, the incremental intrusion on Aguirre's privacy caused by opening his driver's-side door "cannot prevail" when weighed against both Tapia's need to complete

---

[9] After he was placed under arrest, Aguirre confirmed that he had been using methamphetamine and fentanyl. Dkt. 18-2, Ex. A at 8.

the mission of the traffic stop and his legitimate safety concerns. *Mimms*, 434 U.S. at 110. As such, even if opening Aguirre's driver's-side door constituted a search, such search was reasonable and thus constitutionally permissible.

### 3.   *"Taint" of Tapia's "initial entry"*

Aguirre next argues that Tapia's illegal entry into his vehicle tainted "all subsequent actions conducted by officers" so the evidence discovered in his vehicle must be excluded. Dkt. 18-1, at 5–6. "Evidence derivative of a Fourth Amendment violation—the so-called fruit of the poisonous tree—is ordinarily tainted by the prior illegality and thus inadmissible[.]" *United States v. Gorman*, 859 F.3d 706, 716 (2017) (cleaned up). Here, as explained above, there was no "prior illegality" to taint the evidence in Aguirre's vehicle. *Id*. That is, because Tapia did not violate the Fourth Amendment when he opened Aguirre's car door, the fruits doctrine is inapplicable.[10]

### B.  Derrick's "entry" into Aguirre's vehicle

Aguirre also contends Derrick unlawfully "placed his face within the vehicle to conduct a drug investigation while the other two officers returned to the patrol car to investigate the traffic stop." Dkt. 18-1, at 8. However, it appears from the body camera footage that Derrick's did not place his head or face inside Aguirre's vehicle prior to the probable cause search, which occurred *after* Derrick smelled the odor of marijuana and

---

[10] In his Motion to Suppress, Aguirre argues only that Tapia's conduct tainted the evidence subsequently discovered in his vehicle. Dkt. 18-1, at 5–6. Although Aguirre does not link Derrick's actions to the fruits doctrine, the Court finds the doctrine is also inapplicable with respect to Derrick because, as discussed below, a mere trespass does not trigger Fourth Amendment protection.

*after* Aguirre admitted to possessing marijuana. *Compare* Dkt. 18-1, at 8 *with* Dkt. 18-2, Ex. B *Tapia* at 1:46–2:02 and *Derrick* at 00:14–1:25.

During the evidentiary hearing, Derrick testified that although he turned his head closer to the vehicle so he could initially hear Aguirre's conversation with Tapia and ultimately speak to Aguirre himself, he did not lean any part of his head inside Aguirre's vehicle at any point during his interaction with Aguirre. Dkt. 38, at 31:16–32:7, 33:16–23. Aguirre did not testify during the evidentiary hearing, and did not cite any portion of the officers' body camera footage to suggest Derrick put his head inside Aguirre's vehicle during the traffic stop. *See generally*, Dkt. 18-1; Dkt. 38. Moreover, although the Government highlighted in its Response brief that the "body-worn camera recordings demonstrate that Officer Derrick's face never entered [Aguirre's] vehicle prior to the probable cause search," Dkt. 27, at 10, Aguirre did not cite any evidence to establish either Derrick's head or his face entered Aguirre's vehicle in his Reply brief. *See generally* Dkt. 31.

As such, the Court again repeatedly reviewed both Derrick and Tapia's[11] body camera footage to determine if Derrick inserted his head or face inside Aguirre's vehicle before Aguirre admitted to possessing marijuana. Dkt. 18-2, Ex. B *Derrick* at 00:14–1:25. Like Aguirre's claim regarding Tapia's purported reach inside the vehicle, the Court finds

---

[11] Because Tapia and Derrick were facing each other on opposite sides of Aguirre's car, Derrick's face is visible on Tapia's body camera footage before Tapia went back to his vehicle to call Aguirre's probation officer. Dkt. 18-2, Ex. B *Tapia* at 1:46–2:02. Although Derrick turned his head towards the vehicle to listen to Aguirre's responses, neither his face nor his head entered the car. *Id.*

there is no evidence that Derrick leaned either his face or his head into and across the plane of the passenger-side window at any point prior to the probable cause search.[12]

The fact that Derrick "changed [his] position" and "bent down at an angle so [he] could see what was inside" Aguirre's vehicle, "is irrelevant to Fourth Amendment analysis." *Texas*, 460 U.S. at 740. "The general public could peer into the interior of [Aguirre's] automobile from any number of angles"—particularly because Aguirre's passenger-side window was completely rolled down prior to the traffic stop. *Id.* As such, there is no reason Derrick "should be precluded from observing as an officer what would be entirely visible to him as a private citizen. There is no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers." *Id.* (citing *Katz*, 389 U.S. at 361). Thus, that Derrick bent down and looked through Aguirre's open window to observe the interior of Aguirre's car was not a search within the meaning of the Fourth Amendment. *Texas*, 460 U.S. at 740.

The Court accordingly considers solely whether Derrick violated the Fourth Amendment by touching Aguirre's passenger-side door. Aguirre argues that a "Fourth Amendment trespass-search" occurred under *United States v. Jones*, 565 U.S. 400 (2012), when Derrick rested his hands on the vehicle. Dkt. 18-1, at 7–9. In *Jones*, the Supreme Court found that the attachment of a GPS tracking device to the undercarriage of a car to

---

[12] During the evidentiary hearing, Aguirre's counsel appeared to concede this by noting, "Whether he breached or not will be a finding of fact for the Court to make, whether he breached the open window or not." Dkt. 38, at 55:1–4.

monitor its movements was search under the Fourth Amendment. 565 U.S. at 404–405. In so holding, the Supreme Court explained "[t]he Government physically occupied private property for the purpose of obtaining information. We have no doubt that such physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted." *Id*. (citations omitted).

Importantly, the *Jones* Court further explained a search occurs not merely when there is trespass on effects, but when the trespass is done to obtain information. *Id*. at 408 n.5. "Trespass alone does not qualify" as a search. *Id*. Instead, a search occurs when a trespass is "conjoined" with "an attempt to find something or to obtain information." *Id*.; *see also Florida v. Jardines*, 569 U.S. 1, 11 (2013) ("That the officers learned what they learned *only by physically intruding* on Jardines' property to gather evidence is enough to establish that a search occurred.") (emphasis added).

Here, Derrick obtained no information, and learned nothing, by resting his hands on Aguirre's vehicle. Aguirre does not cite any evidence or applicable authority to suggest either that Derrick touched the vehicle for the purpose of obtaining information, or that Derrick learned Aguirre possessed marijuana "only" because he touched the vehicle.[13] *Jardines*, 569 U.S. at 11. Instead, Derrick learned Aguirre possessed marijuana because he

---

[13] Aguirre does rely on an Idaho state case holding an unlawful search occurred when a narcotics detection dog placed its paws on a defendant's passenger-side door. Dkt. 18-1, at 8–9 (discussing *State v. Dorff*, 526 P.3d 988, 997 (Idaho 2022)). Where, as here, "States go above the Fourth Amendment minimum, the Constitution's protections concerning search and seizure remain the same." *Virginia v. Moore*, 553 U.S. 164, 173 (2008). The Court accordingly declines Aguirre's invitation to expand the Fourth Amendment's protections beyond that recognized by the Supreme Court in *Jones*, 465 U.S. at 408 and *Jardines*, 569 U.S. at 11.

could smell it through Aguirre's open passenger-side window and because Aguirre confirmed he had marijuana in his car. Because Derrick's "trespass" was incidental and had no investigatory purpose or result, the Court finds touching the vehicle did not constitute a Fourth Amendment search.[14] *Id*.; *Jones*, 565 U.S. at 408 n. 5.

### C. "Expansion" of the traffic stop

Finally, Aguirre argues "Derrick's extrinsic investigation into whether or not Mr. Aguirre had possession of drugs amounted to an unconstitutional expansion of the traffic stop." Dkt. 18-1, at 12 (citing *State v. Aguirre*, 112 P.3d 848, 852 (Id. Ct. App. 2005)).[15] Although authority for a traffic stop "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed," the Supreme Court tolerates "certain unrelated investigations that [do] not lengthen the roadside detention." *Rodriguez*, 575 U.S. at 354. For instance, in *Illinois v. Caballes*, 543 U.S. 405, 407 (2005), the Supreme Court held a dog sniff conducted during a lawful traffic stop—even in the absence of any articulable

---

[14] As with Tapia's opening of Aguirre's car door, the fruits doctrine is inapplicable to Derrick's conduct since a Fourth Amendment violation did not occur. *Gorman*, 859 F.3d at 716. Because the Court finds the officers acted lawfully, it does not address the Government's contention that the evidence in Aguirre's car would have been inevitably discovered even if the officers violated the Fourth Amendment. Dkt. 27, at 18-19.

[15] In *State v. Aguirre*, officers lawfully pulled over a vehicle, but then entirely abandoned the mission of the traffic stop to pursue an unrelated drug investigation. 112 P.3d at 852. Although the driver was eventually ticketed *after* he was arrested and transported to jail for a weapons offense, the officers "made no effort to pursue the initial purpose" of the traffic stop and "the collective effort of the police was uniformly directed at a drug investigation completely unrelated to the stop." *Id*. Under such circumstances, the Idaho Court of Appeals held the officers' use of a drug dog impermissibly extended the duration of the detention authorized by *Terry*. *Id*. By contrast, Peccorini was in the process of issuing Aguirre's traffic infractions when, a mere two minutes and thirty seconds after he and Tapia first approached Aguirre's vehicle, Aguirre admitted to possessing marijuana. Because Derrick's two questions regarding marijuana did not prolong the traffic stop beyond the time reasonably required to complete issuing Aguirre's ticket, the seizure here remained lawful. *Rodriguez*, 575 U.S. at 354–355.

MEMORANDUM DECISION AND ORDER - 21

facts to suggest drug activity—did not violate the Fourth Amendment's proscription of unreasonable searches because it did not prolong the stop beyond the time reasonably required to complete the mission of issuing a ticket. Similarly, in *Arizona v. Johnson*, 555 U.S. 323, 327–328 (2009), the Supreme Court held questioning by the police about a matter unrelated to the traffic stop did not make the stop unlawful "so long as [unrelated] inquiries do not measurably extend the duration of the stop." *Id*. at 333; *see also Muehler v. Mena*, 544 U.S. 93, 101 (2005) (holding because unrelated inquiries did not "exten[d] the time [the driver] was detained … no additional Fourth Amendment justification" was required).

Here, Aguirre does not suggest the duration of the stop was extended by Derrick's approximately ten-second drug "investigation," Dkt. 31, at 7, and the officers' body camera footage shows Peccorini was diligently preparing Aguirre's tickets when Derrick asked Aguirre how much marijuana he had in the car and Aguirre ultimately responded, "Not a lot … it's in the back." *Compare* Dkt. 18-2 Ex. B *Derrick* at 1:15–1:25 *with Peccorini* at 1:43–2:58. Because Derrick's inquiries did not prolong the traffic stop "beyond the time reasonably required to complete the mission of issuing a warning ticket," the seizure was not unconstitutionally expanded, regardless of whether or not Derrick had reasonable suspicion to ask such questions.[16] *Rodriguez*, 575 U.S. at 354–355; *Caballes*, 543 U.S. at 407–408; *Johnson*, 555 U.S. at 327–328.

---

[16] Reasonable suspicion "exists when an officer in aware of specific, articulable facts which, when considered with objective and reasonable inferences, form the basis of particularized suspicion." *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc). Although not required, it appears Derrick had reasonable suspicion to ask whether there was marijuana in the car because he testified both that Aguirre appeared lethargic and, more importantly, that he smelled marijuana prior to asking about it. Dkt. 38 at 30:21–22, 32:8–11.

## D. Automobile Exception

The automobile exception allows officers "to conduct a warrantless search of a vehicle" where, as here, "they have probable cause to believe that it contains contraband." *United States v. Fowlkes*, 804 F.3d 954, 971 (9th Cir. 2015). Upon Aguirre's admission that there was marijuana in his car, Derrick had probable cause to search the entire vehicle, including the containers within it. *Poulas v. United States*, 95 F.2d 412, 413 (1938) (finding defendant's admission to possessing contraband was "abundantly sufficient to give the officers probable cause[.]"); *United States v. Ross*, 456 U.S. 798, 825 (1982) ("If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.").

## V. CONCLUSION

For the reasons explained above, the Court finds the traffic stop and subsequent search complied with the Fourth Amendment. Aguirre's Motion to Suppress is accordingly denied in its entirety.

## VI. ORDER

**IT IS HEREBY ORDERED**:

1. Aguirre's Motion to Suppress (Dkt. 18) is **DENIED**.

DATED: October 7, 2024

David C. Nye
Chief U.S. District Court Judge